■ In the Matter of Patrick J. Ivory, Jr., Respondent, v City of New York, Department of Environmental Protection, Appellant.—Order and judgment (one paper) of the Supreme Court, New York County (Gammerman, J.), entered September 11, 1985, which granted the petition and annulled the final determination of the Commissioner of the Department of Environmental Protection, dated October 5, 1984, terminating petitioner from city service, solely to the extent of remanding the matter to respondent for the imposition of a penalty other than that which would deprive him of his job and accumulated pension, is reversed, on the law, and the petition dismissed, without costs or disbursements.

The facts as set forth in the dissent are fairly stated. Both Special Term and the dissent view the penalty of termination imposed by the Commissioner to be shocking to the court's sense of fairness. The majority is of the opinion, however, that

it cannot interfere with the sanction imposed. Thus, while the penalty may have been severe, especially in light of petitioner's length of service, the test mandated for a reviewing court is not whether it would have imposed the same or a different penalty, but whether the Commissioner acted reasonably within the scope of his authority *(Matter of Pell v Board of Educ.,* 34 NY2d 222, 238). As noted by the Court of Appeals in *Pell* (p 238): "[p]ensions are not only compensation for services rendered, but they serve also as a reward for faithfulness to duty and honesty of performance".

It should be noted that petitioner's activities in collecting football bets while on duty attracted considerable notoriety in the small community in which he was employed. In light of all the facts present before the Commissioner, including the independent illegality of petitioner's conduct while absent from his duties and the tendency in the small community for petitioner's activities to bring disrepute upon the agency, it cannot be said that " 'the measure of punishment or discipline imposed is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.' " *(Matter of Pell v Board of Educ., supra,* p 233.) Concur—Sullivan, Ross, Carro and Asch, JJ.

Sandler, J. P., dissents in a memorandum as follows: Petitioner was employed as a laborer by the Bureau of Water Resources of the New York City Department of Environmental Protection (the Department) since June 20, 1960. In 1982 the police, acting on an anonymous tip, observed petitioner leaving the Department's premises in Mt. Kisco on four successive Saturday mornings at about 10:00 A.M. to collect betting slips on football games from various commercial establishments and private apartments in the area. With minor variations, petitioner would then return to the plant at about 11:30 A.M. and then leave again briefly at 1:00 P.M. to drop the betting slips off at a location maintained for that purpose.

Petitioner was arrested. He pleaded guilty to possession of gambling records in the second degree, a misdemeanor, and in March 1983 he was sentenced to a conditional discharge, a $250 fine and a $40 penalty assessment. On March 22, 1983, the court issued to petitioner a certificate of relief from disabilities pursuant to Correction Law § 702.

When the Department learned of petitioner's conviction, charges were filed against him, and a hearing was held before a Disciplinary Inquiry Leader (DIL). Petitioner was found guilty of the following charges, numbered here to correspond

to the statement of charges, all based upon his having left the Mt. Kisco sewage treatment plant without authorization on four occasions to collect football betting slips: (2) He engaged in outside activities that interfered with his duties. (I observe that the DIL found no evidence that petitioner's activities actually interfered with his duties, but rather had the potential for doing so.) (4) He engaged in conduct prejudicial to good order and discipline. (6) He failed to accurately record his arrivals and departures. (7) He left his assigned work location without authorization. (8) He failed to notify the Department of his arrest and conviction.

Petitioner was found not guilty of the following numbered charges: (1) gambling on Department premises; (3) neglecting his assigned duties; and (5) falsifying Department records. With regard to issue of penalties, imposed with respect to charges (6) and (7), the DIL found that petitioner had been paid $23 for each of the 1½-hour periods that he had been absent without authorization. (The drop offs of the betting slips between 1:00 P.M. and 1:30 P.M. took place during petitioner's authorized lunch break.) It was, therefore, recommended that petitioner should forfeit this pay, that he should pay an additional penalty of three times that amount for each incident (which amount was rounded off to $100 per absence), that he should forfeit one week of vacation for each incident, and that he should be permanently barred from Saturday and Sunday assignments. It was also recommended that petitioner be penalized the sum of $100 and one week's vacation upon charges (2) and (4).

In reaching his recommendations as to the appropriate penalties to be imposed upon the petitioner, the DIL took into consideration the following pertinent facts: Except for the instant charges, petitioner had an unblemished record of almost 25 years with the Department. The petitioner's supervisors reported that he was a reliable and conscientious employee. Finally, in previous cases where Department employees had been found guilty of being absent without leave, penalties short of termination had consistently been imposed.

By letter dated October 5, 1984, the Commissioner of the Department advised petitioner that the DIL's factual findings were approved, but that he considered the recommended penalties (forfeiture of five weeks' paid vacation and $500, plus permanent restriction from weekend assignments) to be too lenient, because petitioner's activity during the approximately six hours of unauthorized absence was "an illegal one done for your own personal gain."

Accordingly, the Commissioner informed petitioner that he had ordered his termination from city service. The most significant aspect of this determination to petitioner and his family was the consequent loss of pension rights accumulated over a period of 24 years of conscientious service.

Petitioner brought a CPLR article 78 proceeding to annul the determination. Justice Gammerman found the penalty imposed by the Commissioner to be shocking to the court's sense of fairness, and remanded the matter for imposition of a new penalty other than one which would deprive petitioner of his job and his accumulated pension. I agree.

I acknowledge that the misconduct that occurred here might reasonably be considered in many circumstances to justify termination of employment. I am unable to persuade myself that it justifies the forfeiture of pension rights earned by over 20 years of faithful service, rights whose acquisition might reasonably have been thought to have been a central consideration in petitioner's choice of his life's work.

The familiar judicial standard in evaluating a challenge to a disciplinary penalty as excessive, restated by the Court of Appeals in *Matter of Pell v Board of Educ.* (34 NY2d 222, 233), is whether " 'the measure of punishment or discipline imposed is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.' " Manifestly, this often-quoted standard embodies a significant subjective element since it is clear that Judges, no less than others, may disagree in that which is perceived as "shocking to one's sense of fairness" as a result of differences in temperament and life experiences.

Less familiar than the simple phrase "shocking to one's sense of fairness", and certainly much less frequently quoted, was the comprehensive discussion of the standard by Judge Stevens in *Matter of Pell (supra,* at pp 234-235, 241): "Of course, terminology like 'shocking to one's sense of fairness' reflects a purely subjective response to the situation presented and is hardly satisfactory. Yet its usage has persisted for many years and through many cases. Obviously, such language reflects difficulty in articulating an objective standard. But this is not unusual in the common-law process until, by the impact of sufficient instances, a more analytical and articulated standard evolves. The process must in any event be evolutionary. At this time, it may be ventured that a result is shocking to one's sense of fairness if the sanction imposed is so grave in its impact on the individual subjected to it that it

is disproportionate to the misconduct, incompetence, failure or turpitude of the individual, or to the harm or risk of harm to the agency or institution, or to the public generally visited or threatened by the derelictions of the individuals. Additional factors would be the prospect of deterrence of the individual or of others in like situations, and therefore a reasonable prospect of recurrence of derelictions by the individual or persons similarly employed. There is also the element that the sanctions reflect the standards of society to be applied to the offense involved. Thus, for a single illustrative contrast, habitual lateness or carelessness, resulting in substantial monetary loss, by a lesser employee, will not be as seriously treated as an offense as morally grave as larceny, bribery, sabotage, and the like, although only small sums of money may be involved.

"There is no doubt that the reason for the enactment of the statute (CPLR 7803) was to make it possible, where warranted, to ameliorate harsh impositions of sanctions by administrative agencies. That purpose should be fulfilled by the courts not only as a matter of legislative intention, but also in order to accomplish what a sense of justice would dictate. Consideration of the length of employment of the employee, the probability that a dismissal may leave the employee without any alternative livelihood, his loss of retirement benefits, and the effect upon his innocent family, all play a role, but only in cases where there is absent grave moral turpitude and grave injury to the agency involved or to the public weal".

"Moreover, in every case there must be sensitive distinction among agencies based upon their responsibilities to the public. Thus, compare a police agency with a municipal electric utility. And, of course, always there must be a persisting discretion exercised to avoid unnecessary hardship to erring human beings not compelled by a supervening public interest."